J. S61008/14

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
v. :
:
ROXANNE TAYLOR, : No. 1641 WDA 2013
:
Appellant :

Appeal from the Judgment of Sentence, September 13, 2013,
in the Court of Common Pleas of Washington County
Criminal Division at No. CP-63-CR-0000827-2012

BEFORE: FORD ELLIOTT, P.J.E., WECHT AND STRASSBURGER,* JJ.

MEMORANDUM BY FORD ELLIOTT, P.J.E.: **FILED FEBRUARY 09, 2015**

Appellant appeals the judgment of sentence imposed following her conviction on numerous charges related to her criminal neglect of her two six-year-old boy and girl twins. Finding no error, we affirm.

Appellant came to the attention of authorities on February 15, 2012, when a stranger found the male child wandering along Seventh Avenue in New Eagle wearing only a diaper and T-shirt. The child's arms and legs were purple, and he was covered with feces. At the hospital, the child was determined to be suffering from hypothermia. A subsequent police investigation uncovered appellant's squalid home, and discovered the twin sister in equally poor condition. Both children were suffering from malnutrition.

---

* Retired Senior Judge assigned to the Superior Court.

On July 16, 2013, appellant was convicted of two counts each of aggravated assault, simple assault, unlawful restraint, false imprisonment, endangering the welfare of children, and recklessly endangering another person.[1]  On September 13, 2013, appellant was sentenced to an aggregate term of 14 to 50 years' imprisonment.  This timely appeal followed.

Appellant raises the following issues on appeal:

1.  Whether the evidence presented during trial lack [sic] sufficient elements of the charges of Aggravated Assault to render a guilty verdict.

2.  Whether the Court erred and/or abused its discretion in granting the Commonwealths' [sic] objection to the introduction of a preliminary transcript of an unavailable witness?

3.  Whether the Court erred and/or abused its discretion during Jury Voir Dire and selection?

Appellant's brief at 6-7.

We find no error with the trial court's analysis.  After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the trial court, it is our determination that there is no merit to the questions raised on appeal.  The trial court's meticulous, 16-page opinion, filed on February 26, 2014, comprehensively discusses and properly disposes of the questions presented.  We will adopt it as our own and affirm on that basis.

---

[1]  18 Pa.C.S.A. §§ 2702(a)(1), 2701(a)(1), 2902(a)(1), 2903(a), 4304(a)(1), and 2705, respectively.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/9/2015

Copies: Molly Maguire Gaussa, Esq.; Traci McDonald, Esq.

IN THE COURT OF COMMON PLEAS OF WASHINGTON COUNTY, PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA )
)
)
vs. )
) NO. 827 of 2012
)
ROXANNE TAYLOR, )
Defendant )

### TRIAL OPINION PURSUANT TO PA. R.A.P. 1925

The Defendant, Roxanne Taylor, was tried before this Court and a jury of her peers from July 9, 2012 through July 15, 2013. She was found guilty of Aggravated Assault, Unlawful Restraint, Endangering the Welfare of a Child, Simple Assault, and Recklessly Endangering Another Person, two counts for each charge. On September 13, 2013, the Defendant was sentenced to a total period of incarceration of not less than fourteen (14) years, to not more than fifty (50) years.

## FACTS

The victims of the crimes committed by the Defendant are Ms. Taylor's two children, E.B. and A.B., six year old twins. The criminal investigation involving the Defendant's conduct began on February 15, 2012. On that day, a man on his way to work at 6:00 a.m. noticed a small child along on the side of the road clad only in a diaper and a t-shirt. (T.T. p. 67) The man, Edward Dermont, stopped immediately, picked up the child and asked him where he lived.[1] The child pointed to the house in front of him.

---

[1] Throughout Mr. Dermont's encounter with the child, he thought E.B. was a girl.

1



Mr. Dermont knocked on the door but no one answered. The child was shivering uncontrollably. Mr. Dermont took the child to his truck, wrapped him in a coat and called his wife, who called the police. Mr. Dermont then drove to his own home located a few minutes away. Both Mr. Dermont and his wife observed that the child's arms and legs were purple, that he was shaking from the cold and was covered in feces. (T.T. pp. 34-8, 40, 67). They wrapped him in an afghan and put a heating pad on him in an effort to warm him. Mrs. Dermont fed him Rice Krispies, toast and hot chocolate, which he readily ate. (T.T. p. 69)

The police arrived within a few minutes and the paramedics arrived and took the child to the emergency room at the Mon Valley Hospital. The paramedic, Kenneth Prunty, observed that the child's hands and feet were purple and mottled and that the child was emaciated and thought he (he also believed the child was a girl) was two or three years old. (T.T. pp. 134, 136-7) Mr. Prunty testified that the child was the worst case of neglect he had seen in his thirty-one years of being a paramedic. (T.T. p. 153).

In the meantime, the police arrived at the defendant's home and tried to rouse the residents therein. Officer Rocco banged on the door and went around the house knocking on windows, hitting the glass with a flashlight to make noise. The officer observed an open window on the side of the house about ten feet off the ground and that the side yard underneath the window was full of dog feces. (T.T. p. 85) After at least one half of an hour, an hour after the child was found, the Defendant Ms. Taylor came to the door. (T.T. p. 89) The officer asked her if she had children and to check on them. The Defendant led Officer Rocco through the house to the children's bedroom. She unlocked

2

a dead bolt on the bedroom door and opened the door. (T.T. p. 91) One child was asleep on a mattress and the window was open; the Defendant stated to the officer that E.B. must have climbed out the window. Another inhabitant of the house, Edward Buckholtz, appeared from another bedroom. Mr. Buckholtz is the biological father of the children.[2]

As the officers went in the home on February 15, 2012, they noticed a terrible stench of urine and feces throughout the home. (T.T. pp. 90, 161) The Defendant kept a large menagerie of animals in the house. There were at least six dogs in the basement, five cats throughout the house and two rabbits in cages. (T.T. pp. 1044-5) When Officer Rocco awoke the child, he noticed that she was very thin and had some feces caked on her. (T.T. p. 91) He noted there were no toys but there was a potty chair full of feces and urine on the floor of the room. Another officer then transported the Defendant, Mr. Buckholtz and A.B. to the emergency room where E.B. was being treated. (T.T. p. 1019)

E.B. arrived at the emergency room by ambulance at 7:00 a.m. He had a temperature of 94.5 degrees, considered to be hypothermic. (T.T. p. 168). The emergency room nurse, Janice Varley, observed that E.B. had a distended belly, that his limbs were extremely thin and that he had bruising on his body. (Exhibits 12, 14-18, 21). The child's diaper was clean but he was covered in feces, all over his feet and most of his body. (T.T. p. 170, Exhibit 22). The child could speak only a few words. His hair was thin and brittle and he had a low potassium level, signs of malnutrition. (T.T. p.p. 173, 178-9).

A.B. was observed to have a distended abdomen and her legs were bowed and thin. (T.T. p. 231). Her hair was thin and matted with urine; she had feces on her body.

---

[2] Mr. Buckholtz was also charged with the same crimes at Case No. 826-12. He pled guilty to Aggravated Assault, two counts, and received a negotiated sentence of two to four years.

3

The children were showered and fed and transported to Children's Hospital of Pittsburgh for further treatment. (T.T. p. 188)

At Children's Hospital, a full medical check-up was completed and a full medical background was obtained. The children were born on January 27, 2006 at full term. At birth, E.B. weighed eight pounds, seven ounces and A.B. weighed seven pounds and six ounces. (T.T. p. 553). Those weights were considered "robust" and were in the 75% percentile. The children's medical care provider was Mon Valley Community Health Service. The children were seen at age three months, at which time they were noted to be progressing normally. They were not seen again until age twenty-three months. By that time, the children had not received the requisite immunizations and had fallen off the charts, in weight and height, and were by then below the fifth percentile. They were diagnosed as failure to thrive. (T.T. p. 555). They were sent to an endocrinologist; no medical condition was found to be the cause of their poor growth. Social Services were contacted and became involved with the family. Washington County Children and Youth Social Service Agency was involved on and off from 2008 until February 2011. In-home parenting was provided and the children were referred to Head Start and speech therapy. The Defendant signed up for the WIC program which included nutrition counseling. Generally, the Defendant was cooperative with in-home services but did not follow through with appointments and therapies provided outside of the home. The last visit to the pediatrician with the Defendant was in January 2011. (T.T. p. 565) E.B. weighed thirty-five pounds and was 39.5 inches and A.B. was thirty-six pounds and 40.5 inches. (T.T. pp. 565, 587) These reflected fairly normal data, above the 25th percentile. By February 15, 2012, a year later, the day E.B. was found outside, the children had lost

4

weight over the year, a very alarming occurrence in children this age. A child at age five and six averages eight to ten pounds a year in weight gain. (T.T. p. 360). Dr. Squires of Children's Hospital observed both children's developmental delays to be at a level of eighteen to twenty-four months behind and because no medical condition was present, the doctor concluded that the developmental delays were caused by an inadequate home environment. (T.T. p.p. 364, 370) Dr. Squires' medical assessment was that the children were subjected to neglect. (T.T. p. 367). Upon discharge from Children's Hospital, the children were placed in foster care. They both quickly gained weight. At the time of trial, fifteen months later, E.B. weighed fifty-nine pounds and A.B. weighed fifty-six pounds, a gain of approximately twenty pounds within a year. (T.T. p.p. 471, 486)

Dr. Wolford of the Child Advocacy Center of Children's Hospital, an expert in the field of child abuse and neglect, reviewed this case and testified that the children were the subject of child abuse and neglect. (T.T. p.p. 370). Dr. Walford quantified their condition as moderate malnutrition. (T.T. p. 371) Physician Assistant Aislynn Jenkins testified that chronic malnutrition impairs long-term brain and organ development (T.T. p. 602).

The Defendant testified that she did not work and was home with the children. She also took care of her disabled brother on a daily basis. (T.T. p. 990) The Defendant took morphine for back pain. (T.T. p. 1064) She explained that she failed to hear Officer Rocco on February 15, 2012 because the air conditioning was so loud. (T.T. p. 1093) The temperature on that day was 35 degrees. (T.T. p. 137) The Defendant also testified that on February 15, 2012, the children were not malnourished and their physical condition as depicted in Exhibits 21 and 29 were normal and appropriate and that the

5

children's condition as depicted in Exhibits 46 and 47 show the children to be overweight. (T.T. p. 1101)

## ISSUES ON APPEAL

The Appellant raises three issues in her concise State of Matters Complained of on Appeal:

### 1. SUFFICIENCY OF THE EVIDENCE FOR AGGRAVATED ASSAULT

The evidence and testimony presented at the time of the Defendant's trial was insufficient to establish Defendant's guilt regarding the charges of Aggravated Assault beyond a reasonable doubt. The elements of Aggravated Assault were not established or proven as the injury was as a result of Aggravated Assault is to be a permanent serious bodily injury. (Statement of Matters Complained of on Appeal, No. 1)

In evaluating a challenge to the sufficiency of the evidence, the Court must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, when viewed in light most favorable to the Commonwealth as the verdict winner, is sufficient to permit the trier of fact to find that each element of the crimes charged were proven beyond a reasonable doubt. Commonwealth v. Hopkins, 747 A.2d 910 (Pa. Super. 2000). If the trier of fact reasonable could have determined from the evidence presented that each element was established, the evidence is deemed sufficient to support a guilty verdict. Id. at 914. The jury has sole responsibility of determining whether to believe or disbelieve a witness. Id. "This standard is equally applicable to cases where the evidence is circumstantial rather than direct so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt." Commonwealth v. Thomas, 67 A.2d 594, 597 (Pa. Super. 2005).

At the trial, the Defendant moved for Judgment of Acquittal of the charge of Aggravated Assault, claiming that the Commonwealth failed to establish that the

6

Defendant acted recklessly under circumstances manifesting extreme indifference to the value of human life and that the Commonwealth failed to establish that either child victim suffered serious bodily injury. (T.T. pp. 751, 760). The Defendant again raised those issues at the conclusion of the trial. (T.T. p. 1124) The issue on appeal, whether sufficient evidence was presented to establish serious bodily injury, has been properly preserved.

The Defendant was charged with two counts of Aggravated Assault, one for each child. The Criminal Information charged the Defendant as follows: "The actor did attempt to cause serious bodily injury to another, namely, six-year old (E.B.) and (A.B.); or caused such injury intentionally, knowingly, or recklessly under circumstances manifesting extreme indifference to the value of human life, in violation of Section 2702 (a) (1) of the Pa. Crime Code Act of December 6, 1972, 18 Pa. C.S.A. §2702 (a) (1), as amended." See Record, Docket No. 9.

To substantiate a guilty verdict for the charge of aggravated assault pursuant to Pa. C.S.A. §2701(a) (1), the Commonwealth must establish beyond a reasonable doubt that 1.) the Defendant caused serious bodily injury to the victim or victims and 2.) that the Defendant acted intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life OR 1.) that the Defendant attempted to cause serious bodily injury to the victim or victims and engaged in conduct that constituted a substantial step toward causing serious bodily injury and 2.) that the Defendant's conduct was intentional, that it was her conscious object or purpose to cause serious bodily injury.

7

The Commonwealth charged the Defendant with either causing serious bodily injury or attempting to cause serious bodily on each child. Causing or attempting to cause were not charged separately. The verdict slip did not reflect whether the jury found that the Defendant actually caused serious bodily injury or attempted to cause such injury.

The Defendant contends in her Concise Statement, that the evidence did not establish that the injury rose to the level of "permanent serious bodily injury" necessary to find Aggravated Assault. Serious bodily injury is defined as any "bodily injury which creates a substantial risk of death or which causes serous permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ." 18 Pa. C.S.A. §2301.

What constitutes serious bodily injury must be decided on a case by case basis. Commonwealth v. Dailey, 828 A.2d 356 (Pa. Super. 2003). It is for the jury to decide if the Commonwealth has proven that serious bodily injury occurred. Here, both children were severely underweight. By all accounts, they were emaciated, had distended bellies and the medical professionals who saw them reported that they looked like children from a Holocaust camp or a third world country. The evidence, if believed, established that the children were neglected. The lock on the bedroom door and the over flowing potty chair are facts from which it could be inferred that the children were left alone for long periods of time. No toys were observed to be available for the children. The children, at age six years of age, were not potty trained, had very limited verbal skills, did not know basic facts and lacked many social skills. The jury could reasonably conclude that they were the victims of abject neglect. Further, the jury could reasonably conclude that the

Defendant failed to provide sufficient food to the children. Dr. Wolford of Children's Hospital opined that the malnutrition impaired the children's growth. E.B. was bow-legged, which caused him to be clumsy and impaired his walking. A.B. was also bow-legged. A jury could reasonably conclude that the lack of nutrition provided to the children slowed their growth, deformed their bones, delayed their language development and impaired the children's overall brain development. The jury could reasonably find that those conditions were "protracted.... impairment of the function of any bodily member or organ."

The jury could also, in the alternative, have found that the Defendant failed to adequately feed the children and neglected them and that the failure created a substantial risk of serious bodily injury, which proves aggravated assault by attempting to cause serious bodily injury. In addition to proving that the Defendant caused or attempted to cause serious bodily injury, the Commonwealth must also have proven that the Defendant possessed the requisite mens rea. For the attempt to cause serious bodily injury, the Commonwealth must have proven that the Defendant had a strict mens rea, that the Defendant's conduct was intentional, that it was her purpose to cause serious bodily injury. The Court recognizes that intent to cause serious bodily injury may be proved circumstantially. Commonwealth v. Rightley, 617 A.2d 1289 (Pa. Super. 1999) However, the case sub judice was devoid of evidence of the Defendant's intent to harm the children. There was no evidence of anger or withholding of food for punishment or retribution. The element of intentionally or knowingly caused the harm was not established. However, the jury could have reasonably concluded that the Defendant's actions constituted a recklessness, that she acted recklessly under circumstances

9

manifesting extreme indifference to the value of human life. The children had no medical conditions that affected the proper absorption or digestion of food. A reasonable inference could be made that they were not fed sufficiently and properly, resulting in a weight of only thirty-five pounds at age six. The Defendant's statement that the children did not appear malnourished upon their admission to the hospital and appear overweight a year later is very telling. One look at those pictures, Exhibits 21, 29, 46, 47, shows how reckless her conduct was and how dangerous the outcome could have been without the chance encounter between a stranger and E.B. The jury could reasonably conclude that the Defendant's treatment and care of her children constituted reckless behavior manifesting an extreme indifference to the well-being and safety of E.B. and A.B.

Thus, the evidence was sufficient to establish that the Defendant caused serious bodily injury to E.B. and A.B. – by failing to feed them sufficiently and by neglecting them, resulting in malnutrition, slowed growth, deformed legs, language delays and an overall failure to thrive. The evidence was sufficient to establish that the failure to provide food and the overall neglect showed a recklessness manifesting an extreme indifference to the value of human life. Sufficient evidence was present to support the jury's verdict that the Commonwealth proved that the Defendant committed Aggravated Assault against each of the children.

## 2. ADMISSIBILITY OF PRIOR TESTIMONY OF DR. HOLEKAMP

The Court erred and/or abused its discretion in granting the Commonwealth's objection to the introduction of the Preliminary Hearing Transcript of Doctor Holekamp introduced by Defense Counsel to Impeach the testifying witness. (Trial Transcript: 191-196). (Statement of Matters Complained of on Appeal, No. 2)

10

The Defendant avers that the Court erred by sustaining the Commonwealth's objection that prior testimony of Dr. Holekamp was inadmissible hearsay. Dr. Holekamp testified at the preliminary hearing as a witness for the Commonwealth, but did not testify at trial.

Hearsay is defined as, "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Pa.R.E. 801(c). Hearsay is generally not admissible. Pa.R.E. 802. However, former testimony can be admissible when a declarant is unavailable and the party against whom the testimony is now offered had an adequate opportunity and similar motive to develop the testimony by direct, cross, or redirect examination. Pa.R.E. 804.

At trial, the Commonwealth called Jamie Lynn Varley as one of its many witnesses. (T.T. at p.167.) On February 15, 2012, she was working as registered nurse at Mon Valley Hospital in the emergency room. Upon arriving at the hospital at 7:00 a.m., Ms. Varley learned that she would be treating a six-year-old boy who was hypothermic. (T.T. p. 168). The child's temperature was at 94.5 degrees at his admission.[3] Id. When the witness was asked to describe the child's appearance at the emergency room, she answered:

> He looked like a child from a third world country. His abdomen was distended, his legs looked like little tree sticks. He just looked broken. I couldn't' believe he was six years old. He looked like a three-year-old. He was in a diaper. He had feces in between his toes, on his hands, stuck on his leg. His feet were reddish, purplish color. His legs looked mottled, like they didn't have enough profusion to the legs.

---

[3] On cross-examination, Ms. Varley testified that the child's temperature was 94.9 degrees.

11

(T.T. pp. 168:21 – 169:6.) Thereafter, the witness offered compelling testimony to the care provided and the deplorable state of the child's wellbeing. She was then offered for cross examination.

During cross-examination, Defense counsel asked the witness if she was aware of Dr. Holekamp's testimony at the preliminary hearing. (T.T. p. 191) The witness was not aware of the Doctor's previous testimony. (T.T. p. 191). An attempt to read from the transcript of the Doctor's testimony was made, which was objected to by the Commonwealth. Specifically, Defense Counsel wanted to introduce the Doctor's statement of "we kind of warmed him up". (T.T. pp. 191-193) He argued that the transcript was not an "out-of-court statement," but rather testimony from a previous hearing and therefore outside the definition of hearsay. Defense counsel also argued that the statement was being used for impeachment purposes. (T.T. p. 192.) At sidebar, Defense counsel's position was that the witness' testimony characterized the child's condition as a severe case, while the Doctor's prior testimony painted a less grim picture of the child's condition and treatment provided. (T.T. pp. 192 -193.) The Doctor's testimony would be used to impeach the witness' credibility. This Court reminded Defense Counsel that he could call the Doctor as a witness if desired, but counsel believed the Doctor's presence was unnecessary. The Court sustained the Commonwealth's objection.

Though a declarant's former testimony may be admissible, such exclusion to the hearsay rule requires that the declarant be unavailable at trial. Pa.R.E. 804(b). Unavailability is defined as:

> "Unavailability as a witness" includes situations in which
> the declarant:

12

(1)     is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of the declarant's statement, or

(2)     persists in refusing to testify concerning the subject matter of the declarant's statement despite an order of court to do so; or

(3)     testifies to a lack of memory of the subject matter of the declarant's statement; or

(4)     is unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity; or

(5)     is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance... by process or other reasonable means.

A declarant is not unavailable as a witness if exception, refusal, claim of lack of memory, inability, or absence is due to the procurement or wrongdoing of the proponent of a statement for the purpose of preventing the witness from attending or testifying.

Pa.R.E. 804(a). The case law surrounding an unavailable witness' prior testimony largely focuses on testimony wished to be introduced by the Commonwealth. See, *Commonwealth v. Stays*, 70 A.3d 1256 (Pa. Super. 2013)(addressing admission of preliminary hearing testimony when a witness had subsequently been murdered); *Commonwealth v. Cruz-Centeno*, 668 A.2d 536 (Pa.Super. 1995)(holding that a witness who cannot be found will be deemed unavailable only if a good-faith effort to locate the witness and compel testimony had failed); *Commonwealth v. Smith*, 647 A.3d 907 (Pa.Super. 1994)(where a witness' refusal to testify at trial rendered him unavailable). Whether a good-faith effort has been made is a question of reasonableness. *Smith, supra.* (citing *Commonwealth v. Melson*, 637 A.2d 633 (Pa.Super 1994)).

The record is devoid of any allegations that Dr. Holekamp was unavailable to attend the trial. He had relocated to Florida. The Commonwealth had suggested that his entire testimony be presented to the jury but the Defendant did not agree. Defense

13

Counsel simply did not believe that the Doctor's presence and testimony were necessary for the limited purpose. No reasonable good-faith effort was made to procure the Doctor's testimony at trial. Inconvenience alone does not manifest unavailability. As such, the former testimony exception did not apply to the Doctor's statement and was inadmissible hearsay.

An out-of-court statement is not hearsay when it is being offered for a purpose other than the truth of the matter asserted. Pa.R.E. 801. Defense counsel argued that the statement would be used for impeachment purposes. This Court notes that this question is analogous to the matter before the Pennsylvania Supreme Court in *Commonwealth v. Baez*, 431 A.2d 909 (Pa. 1981). There, the defendant testified in his homicide trial. On cross-examination, the Commonwealth impeached the defendant with verbatim statements made by a witness to the slaying as recorded by the investigating officer. The Commonwealth made a similar argument: that the statements were not hearsay, as they were only offered for impeachment purposes and not offered for the truth of the matter they asserted. *Id.* at 912. The Supreme Court stated,

> In our view, however, this argument either reflects a hopelessly shallow understating of the function of the hearsay rule, or, worse, disingenuously seeks to defend a subterfuge to introduce otherwise inadmissible evidence under the guise of impeachment. The statement... for impeachment by contradiction, by its very nature is founded upon the truth of the contradictory evidence offered.
>
> * * *
>
> The statement here in question, obviously incompetent hearsay if offered as direct evidence, gained no competency by virtue of the fact that it was brought out on cross-examination in an effort to establish that [defendant's] recitation of the facts was untrue.

*Id.* at 912 – 913.

14

Ms. Varley characterized the child's condition as severe. The Doctor's isolated prior statement suggested a less severe condition. Defense counsel's goal was to convince the jury that the nurse's opinion was skewed and they should give greater weight to the Doctor's isolated statement. The Doctor's testimony would be used exactly for the matter that it asserted. The statement was unquestionably inadmissible hearsay. The Court did not commit error.

### 3. VOIR DIRE

The Court erred and/or abused its discretion during Jury Vior Dire and selection. The Court did not allow for a second day of jury selection and limited the Defendant's selection of impartial jurors by way of denying a second day of Jury selection. (Statement of Matters Complained of on Appeal, No. 3)

As a threshold matter, the Court finds that this issue is waived. Under Pa. R. App. P. 302(a), issues not raised in the lower court are waived and cannot be asserted for the first time on appeal. Pa. R.A.P. No. 302 (a); Commonwealth v. Fitzgerald, 877 A.2d 1273 (Pa. Super. 2005). At no time did the Defendant request more jurors or ask for "a second day of jury selection."

Jury selection began on July 8, 2013 at 2:05 p.m. (See Transcript July 8, 2013). The pool consisted of thirty-eight potential jurors. Five were stricken for cause at the motion of the Defendant. Those jurors were 88, 321, 308, 21, and 14. Additionally, Defendant moved to strike an additional five (5) jurors (No. 51, 96, 94, 310, and 382) which were denied. The Commonwealth and Defendant were each afforded seven preemptory strikes. There were more than a sufficient number of qualified jurors from which to choose. The Commonwealth and Defendant then selected twelve jurors followed by two alternate jurors. This described process was never objected to the Defendant. Accordingly, any issue arising from jury selection is waived on appeal. Even if the five jurors which the Defendant had asked to be excused had been struck, a

15

sufficient number of jurors remained and were available when the selection was to begin. Fourteen jurors and fourteen strikes for a total of twenty-eight persons were needed. The Court did not limit a second day of jury selection. There was absolutely no need for more jurors or a second day. The jury selection was fair and impartial and the Court committed no error in the voir dire.

## CONCLUSION

The conviction of Roxanne Taylor on all counts should be affirmed.

BY THE COURT:

KATHERINE B. EMERY, JUDGE

Date: Feb. 26, 2014

16